UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | } | |
| | } | |
| Steven T. Estrada, | } | CASE NO.    05-42028-JJR-13 |
| | } | |
| Debtor(s). | } | CHAPTER: 13 |
| | } | |

___

| | | |
|---|---|---|
| | } | |
| Steven T. Estrada, | } | |
| | } | |
| Plaintiff(s), | } | ADV. P. NO.: 06-40007 |
| | } | |
| v. | } | |
| | } | |
| Donna Estrada, | } | |
| | } | |
| Defendant/ | } | |
| Counter Claimant | } | |
| | } | |
| v. | } | |
| | } | |
| Steven T. Estrada, | } | |
| | } | |
| Counter-Defendant. | } | |

### **Memorandum Opinion**

The Debtor-Plaintiff, Steven Estrada (the "Debtor" or "Plaintiff") filed chapter 13 bankruptcy on June 13, 2005, and commenced this adversary proceeding on January 11, 2006. Debtor's chapter 13 plan provided for the sale of his house with the net proceeds to be paid to the Chapter 13 Trustee and distributed to allowed claim holders. The Debtor's house (the "house" or "property") was owned by him prior to his marriage to the Defendant/Counter-Claimant, Donna Estrada (the "Defendant"), and was their common homestead while they lived together as husband and wife. After the parties separated, the Plaintiff moved out of the house, but the Defendant and her adult son from a previous marriage continued to live in the house until shortly before it was sold.

The Plaintiff's complaint alleges that the Defendant: (i) interfered with the sale of the house by not allowing the real estate agents reasonable access to show the property to prospective buyers,

(ii) caused the purchaser of the house to significantly reduce the price he was willing to pay because the Defendant removed various appliances from the house before the sale closed, and because the Defendant failed to dispose of trash which she left at the property when she moved, and (iii) delayed the sale of the house, thus causing the mortgage payoff to unnecessarily increase because of additional accrual of interest. The Plaintiff alleges the Defendant should be held in contempt for interfering with this court's order confirming the Debtor's chapter 13 plan, which called for the sale of the house, and that her actions violated of the automatic stay. The Plaintiff seeks damages of $70,000 plus attorney's fees and costs.

The Defendant denies interfering with or delaying the sale of the house. She alleges she was entitled to remove the appliances, and she asserts a counterclaim against the Plaintiff for the loss of a 1974 Chevrolet Nova taken from the yard of the property without the Defendant's permission. In her counterclaim the Defendant seeks $100,000 in compensatory and punitive damages.

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 157 and 1334 and the Order of Reference of the District Court. This adversary proceeding and counterclaim are core proceedings pursuant to 28 U.S.C. § 157(b)(2). For the reasons stated below, the Court is denying recovery on any of the claims presented in the Plaintiff's complaint and the Defendant's counterclaim.

For the most part, this adversary proceeding and counterclaim are extensions of a very acrimonious divorce proceeding between the parties that was commenced in 2003 and is still on-going with little or no progress having been made toward a final divorce decree or determination of property rights. Neither the Debtor nor the Defendant presented evidence that a divorce decree has been entered by the state domestic relations court in which their divorce proceedings is pending (the "State Court"). Moreover, neither party has sought relief from the automatic stay of 11 U.S.C. § 362(a) for the purpose of allowing the State Court to determine an appropriate division of property in which the Debtor's bankruptcy estate and the Defendant share an interest. *Cf* 11 U.S.C. § 362(b)(2)(A)(iv). Thus, this Court must conclude that the Plaintiff and the Defendant remain husband and wife, and there has been no determination and division of property rights between the parties. The Defendant made no claim that she had any interest in the house or its sale proceeds, and asserted no objection to the Debtor's chapter 13 plan that calls for such proceeds to be paid to his creditors. So this Court must also conclude that when and if there is a determination of the property rights between the parties, it will not concern the house or its sale proceeds. Finally, in light of the

parties' apparent lack of interest in having a determination made of their respective property rights, the Court doubts that either party will ever seek relief from the stay for the purpose of going forward with such a determination in State Court.

At the trial held on August 9, 2006, Mrs. Mary Jo West, a real estate agent employed to sell the house, testified that the typical value of homes in the neighborhood where the house was located, was approximately $109,000. Mrs. West stated that because of the condition of the house, she believed it would sell in the range of $82,000 to $84,000. Mrs. West testified there was "deferred maintenance," including a patched roof, a disabled vehicle in the front yard (the Defendant's 1974 Nova), and the property needed landscaping and cleaning. Thus, the house was priced at $84,900 for a quick sale to a potential buyer who, according to Mrs. West, would likely acquire the property as an investment.

Real estate agent West stated she experienced problems showing the house to prospective buyers because the Defendant would not allow the property to be shown unless the Defendant was present, and would not allow the house to be shown during convenient day-time hours. Mrs. West also complained that while the house was being shown, the Defendant would make derogatory remarks about the property's condition.

The Defendant testified that she did not feel comfortable having strangers in her home while she was not present. She also stated that she wanted to be home when the house was shown because her son worked a night-shift and slept during the day, and she did not want him disturbed. The Defendant averred that she did accommodate agent West by leaving her place of employment during her lunch hour to meet West and potential buyers at the property. She explained that her derogatory, but truthful, remarks about the condition of the property were in response to pointed questions posed by a potential buyer. The Defendant testified that she met agents, other than Mrs. West, at the property to accommodate an inspection by potential buyers, and that on at least one occasion, agent West made an appointment to show the property but failed to keep the appointment.

There was no evidence explaining why the Defendant remained in the house while it was being offered for sale by the Debtor's estate. Perhaps the Defendant remained by agreement of the parties, or under an order from the State Court. Whatever the reason, there was never any request made of this bankruptcy Court seeking removal of the Defendant from the house.

After hearing the testimony of agent West and her husband (also a real estate agent), and that of the Plaintiff and Defendant, it is obvious to the Court that the Defendant did not "bend over

backwards" to accommodate the real estate agents who wanted to show the property to potential buyers. Whether her lack of cooperation amounted to interference with the consummation of the Debtor's chapter 13 plan or violated the automatic stay is difficult to determine from the evidence presented. More importantly, it would be speculation to conclude that if the Defendant had been more cooperative, the property would have sold sooner and for more money.

Before leaving the issue of the Defendant's cooperation or lack thereof, the Court will point out that there was no explanation offered by the Plaintiff as to why he did not take time off from his employment or otherwise make himself available to allow the property to be shown to potential buyers. After all, the property being sold was property of the Debtor's estate, and his creditors would be receiving the sale proceeds. Perhaps the Plaintiff was prohibited by an order of the State Court from coming onto the property while the Defendant, his wife, lived there. There was no evidence to explain why the burden of accommodating the real estate agent and potential buyers should fall on the Defendant. Perhaps there was a good reason, but no evidence was offered for the Court to consider regarding that issue.

Accordingly, based on the evidence the Court considered credible, the Court cannot conclude that the Defendant's conduct in connection with the efforts to sell the house reached a level of culpability that should result in her being held in contempt of the order confirming the Debtor's chapter 13 plan that provided for the house to be sold, or constituted a violation of the automatic stay.

In any event, an offer to purchase the house for $72,500 was eventually received by an interested party, subject, however, to a final inspection. Although neither the Plaintiff nor the Defendant provided the Court with a copy of the contract evidencing this offer, the Debtor filed a notice of intent to sell the property on January 13, 2006 (Doc. No. 56) and a copy of a contract dated January 12, 2006 (the "first contract") was filed with the motion. The first contract contained a purchase price of $72,500 and was signed by Gary Couvillion as purchaser. On March 13, 2006 the Court entered its order approving the sale for $72,500 (Doc. No. 76).

The proposed sale for $72,500 did not close. On April 18, 2006 the Debtor filed another notice of intent (Doc. No. 86) to sell the property to the same purchaser, but this time for a purchase price of $64,000. And although neither party provided the Court with a copy of the contract evidencing the $64,000 sale, a contract dated April 16, 2006 (the "second contract") was filed with the motion seeking Court approval of the sale. On May 17, 2006 the Court entered its order

approving a sale under the second contract (Doc. No. 96).[1]

Under paragraph 14 of the first contract, the purchaser checked the box that indicated he required a "home inspection." The first contract provided that within three business days of completing the inspection, the purchaser would provide the seller with a written list of conditions he wanted corrected. If the inspection revealed major defects or conditions unsatisfactory to the purchaser, he was entitled to terminate the contract. No such list of the conditions the purchaser wanted corrected was offered as evidence at trial, and the Court was not informed if the purchaser ever provided such a list to the Debtor or his agent. Under the second contract, the purchaser did not require a similar inspection, but in a handwritten provision he did require a "walk thru the day of closing to make sure that the home [was] in the same condition as [at] the time of [the] home inspection." Since no home inspection was required under the second contract, the Court assumes the reference to the home inspection was the inspection made under the first contract.

The second contract, unlike the first, contained a "Personal Property Addendum" on which was listed the items of personal property that were to be sold with the house. No such addendum was attached to the first contract, the purchaser was not called as a witness, and there was otherwise no direct evidence (that is, evidence other than hearsay and speculation) of the purchaser's expectations regarding what items of personal property he considered as being included under the first contract. In any event, after the inspection the purchaser withdrew his $72,500 offer under the first contract, and reduced his offer to $64,000 under the second contact. There was no disagreement that the house finally sold for $64,000.

The Plaintiff claims the purchaser reduced his offer from $72,500 to $64,000 because several appliances had been removed from the house and because there was a significant amount of trash left in the house after the Defendant and her son vacated it. The purchaser was not called as a witness at trial, thus the Court will not speculate what caused the purchaser to reduce his offer from $72,500 to $64,000. Perhaps the removal of appliances and the trash left by the Defendant had a bearing on the purchaser's decision to reduce his offer; however, there was also evidence that during

---

[1] The copies of first and second contracts attached to the motions seeking approval of the respective sales were only signed by the purchaser, and not by the Debtor. Perhaps the Debtor signed the contracts after obtaining Court approval. In any event, the failure of the Debtor to sign the contracts, if in fact he never signed them, was not an issue between the Debtor and Defendant. It is unknown if this was an issue between the purchaser, who refused to close under the first contract, and the Debtor.

his inspection the purchaser became concerned with evidence of a potential moisture problem not previously discovered and the condition of the HVAC system. Additionally, the Defendant testified that a large portion the trash left behind consisted of clothes and other personal property belonging to the Plaintiff and his children.

The Defendant admitted to removing the stainless steel kitchen sink, a fan/light combination fixture, a stove, a refrigerator, a washer, a dryer, and two freezers. Initially the Plaintiff claimed the Defendant also wrongfully removed the dishwasher and a light fixture located in or near the kitchen. The Defendant testified that after the Plaintiff moved, but before the house sold, the dishwasher stopped working, was leaking, and was finally put in the trash and hauled away. The Plaintiff did not further contest the Defendant's explanation of why the dishwasher was missing. Also no longer an issue is a broken light fixture located in or near the kitchen area. Because that fixture had been removed during renovations and before the parties' separation, the Defendant had no duty to replace it. That leaves at issue the missing kitchen sink, the fan/light combination, the stove, the refrigerator, the washer, the dryer, and two freezers.

The Defendant testified that she displayed a conspicuous message board on which she listed the appliances she intended to remove from the house and that would not be sold. There was no evidence offered regarding whether the purchaser was shown this message board, although it could be inferred that during an inspection of the house it would have been seen by a potential purchaser. Additionally, it was never clear exactly what appliances were listed on the message board.

The Defendant testified she removed the steel kitchen sink because it was hers prior to the marriage and before she moved into the house. She stated that she purchased a replacement sink made of fiberglass and left it at the house, but never had it installed or connected to plumbing.

The Defendant testified that she told the real estate agents she intended to take the light/fan combination fixture because it was a wedding present. Agent West testified that while it is not uncommon for light/fan fixtures to be removed when a house is being sold, the buyer should be informed it is not being sold with the house, and if removed, it should be replaced with a fixture of like kind. The Defendant offered little or no explanation of why she took the other appliances. The Court assumes she believed she was entitled to these items and was effectuating her view of an equitable property settlement.

Alabama law generally holds that "when a divorce decree is granted without any mention of the division of the parties' jointly owned property, each party retains the same right, title, claim,

or interest therein which they held prior to the divorce. In essence, when the trial judge does not alter ownership that, in and of itself, disposes of the issue, and title to the property is left undisturbed by the judgment." Hocutt v. Hocutt, 491 So. 2d 247, 249 (Ala. Civ. App.1986), citing Dominex, Inc. v. Key, 456 So. 2d 1047 (Ala.1984); Coffelt v. Coffelt, 390 So. 2d 652 (Ala. Civ. App.1980). Though no divorce decree has been entered in this case dividing the property, the above case law is still applicable. Thus, each party retains his or her ownership in the property as was held prior to initiation of the divorce proceedings. There lies the problem with deciding this case. Who owned the light/fan combination, stove, refrigerator, freezers, washer and dryer? For some of these appliances, the Plaintiff had invoices or a proof of purchase in his name. But when a husband and wife purchase property for their common household use, the name of one of them on a sales receipt does not prove ownership. Other than the kitchen sink, both parties confirmed that all these removed appliances were acquired during or at the time of the marriage (the fan/light combination being a wedding present). If the appliances removed by the Defendant were not fixtures and thus not part of the Plaintiff's house, who is to say these appliances would not ultimately be determined to be the property of the Defendant if the State Court was ever asked to make a determination of an appropriate division of property between the parties?

Because there has been no judicial or agreed determination of the ownership of the marital property we do not know who owned the appliances when they were removed. If they were property of the Debtor's estate, then their removal was a violation of the automatic stay. The answer is probably that the appliances belonged to both the Plaintiff and Defendant under joint ownership. That joint ownership continues until there is a divestiture of one party's title through a division of their marital property, either by agreement or by judicial determination. This federal bankruptcy Court is not going to make that determination in this case. After hearing the testimony of both the Plaintiff and Defendant, it is abundantly clear that this adversary proceeding is, for the most part, a continuation of the parties' contested divorce proceedings. The parties have come to the wrong court for a ruling on a division of their personal property acquired during their marriage.

Nonetheless, even if this Court were to make a determination that the appliances removed by the Defendant were property of the estate, there was no credible evidence of the values of these appliances, or of the resulting reduction in the sale price of the house. The Plaintiff and agent West gave their opinions of the value of used stoves and refrigerators, which sounded to the Court to be mere guesses. Neither testified regarding the make, model, or condition of these appliances, or the

Case 06-40007-JJR    Doc 25    Filed 09/08/06    Entered 09/08/06 07:57:51    Desc Main
Document    Page 7 of 10

basis of their opinions. And even if the Court were to accept their opinions in respect to the stove and refrigerator, there was absolutely no evidence offered to prove the value of the fan/light combination, sink, washer, dryer or freezers.

As mentioned above, there was no direct evidence proving that the purchaser of the house reduced his offer by $8,500 because of the missing appliances and trash left by the Defendant. Obviously, a clean house with all appliances is worth more than one with trash and without appliances, but there was evidence of other conditions which might have contributed to the purchaser's reduced offer. The Court will not guess how much of the reduction was attributable to the actions of the Defendant and how much to other causes. Moreover, is the amount the price was reduced the correct measure of damages? The Plaintiff did not have to accept the $64,000 offer under the second contract. The price the property ultimately sold for does not establish its value. While agent West offered a range within which she expected the property to sell, she never gave her opinion of the property's value, and more importantly, never gave her opinion of its value with the appliances in place and the trash removed, compared with the condition it finally sold for after the appliances were removed and trash was not. One measure of damages for the wrongful removal of the appliances and failure of the Defendant to remove the trash (assuming she had a duty to remove the trash) would be the loss in the property's value due to the Defendant's actions, i.e. the difference in the value of the house with the appliances in place and the trash removed compared to its value without the appliances and with the trash remaining. Another measure of damages, already discussed above, would be the replacement values of the appliances and expense of removing the trash. In any event, damages were not proven, and the Court will not speculate by arbitrarily setting damages, especially in a case where the motives of the parties are questionable. Because the Court concludes that the evidence of the amount of damages is too speculative or nonexistent, there is no need to labor with the issue of whether the appliances were property of the estate. The foregoing conclusion is equally applicable to both the value of the appliances themselves and the value the house might have lost due to the removal of the appliances and failure to remove the trash.

If there had been credible evidence of values, the removal of the kitchen sink and possibly the stove would have raised an issue for this bankruptcy Court even if the ownership of the other appliances was left undetermined. The original sink, though purchased by the Defendant, became a fixture and part of the house, which was property of the estate. If the stove was "built-in" as opposed to being "free standing" (there was a conflict in the evidence regarding whether the stove

was built-in or free standing), it too could be classified as a fixture and part of the house. A fixture is "an article that was once a chattel, but which, by being physically annexed or affixed to realty, has become assessory to it and 'part and parcel of it.'" Ex parte Brown, 485 So. 2d 762, 764 (Ala. Civ. App. 1986), citing Milford v. Tenn. River Pulp & Paper Co., 355 So. 2d 687 (Ala.1978). Removal of the sink, and possibly the stove, were a violation of the automatic stay and an unlawful appropriation of property of the estate. However, no evidence was provided regarding the sink's value, or credible evidence of the stove's value, or the loss in value suffered by the house as a result of their removal.

The Plaintiff also testified that his mortgage balance increased as a result of the delayed closing caused by the Defendant. The Plaintiff testified that at time of the first offer on the house, his mortgage balance was $46,114.70. By the time the sale closed, not only had the price been reduced, the mortgage balance had increased to $47,092.65. While defendant's attorney proffered testimony that the difference between those amounts is $1,611.83, the actual difference is $977.95. However, as discussed above, we do not know if the purchaser withdrew his offer under the first contract and the closing was delayed because of the Defendant's conduct or if it was because of other reasons not attributable to the Defendant. Unfortunately, the purchaser did not testify, so we do not know his reasons. Accordingly, the Court will not award damages for the delay in closing between the first contract and the second contract. To do so would be too speculative based on the evidence presented.

The final issue to be addressed is the Defendant's counterclaim. The 1974 Chevrolet Nova was wrecked in 1998 and had remained in the property's front yard ever since. Though the Defendant admitted the vehicle was not driveable in its wrecked condition, she believed the car did have value as a vintage collector's item, and removal of the vehicle caused her monetary damages. The testimony of the parties was conflicted, and there was insufficient evidence for the Court to find the car was removed under the direction of the Debtor. Although the Debtor likely made the phone call to the city to ask about removing an abandoned vehicle, the Defendant did not prove the two men who removed the vehicle were in fact from the city or otherwise acting at the direction of the Debtor. In addition, no evidence was presented regarding the value of the wrecked, rusted, and unworkable vehicle, thus the Court is unable to award damages even if it could establish liability. Frankly, the Court believes the counterclaim was more of a defensive tactic and, like the Plaintiff's complaint, had more to do with the parties' matrimonial battles than their desire to be reasonably

compensated for their losses. Bankruptcy courts are not domestic relations courts, and the Eleventh Circuit has admonished bankruptcy courts to not meddle in family law matters traditionally left to the expertise of state courts. Carver v. Carver, 954 F.2d 1573 (11th Cir. 1992).

Because there was insufficient evidence for the Court to assess and award damages, attorneys fees, and costs, in respect to any and all the claims asserted by the Plaintiff, it is Ordered, Adjudged, and Decreed that a judgment should be entered in favor of the Defendant and against the Plaintiff in this adversary proceeding on all claims asserted in the Plaintiff's complaint. Likewise, because there was insufficient evidence for the Court to assess and award damages, attorneys fees, and costs, in respect to any and all claims asserted by the Defendant/Counter-Claimant, it is Ordered, Adjudged, and Decreed that a judgment should be entered in favor of the Plaintiff and against the Defendant-Counter-Claimant in this adversary proceeding on all claims asserted in the Defendant's/Counter-Claimant's counterclaim. An separate judgment shall be entered reflecting the above opinion of the Court.

Dated: September 7, 2006

/s/ James J. Robinson
JAMES J. ROBINSON
United States Bankruptcy Judge